And we'll turn to the next case on the calendar, which is Maneker against Hofstra University. Mr. Howe. Good afternoon, Stephen Howe for Plaintiff Appellate. The complaint here focuses on the actions of Hofstra's EEO officer, Jennifer Mohn, which included a deliberate decision by her to disregard Hofstra's own procedures for handling allegations of sexual harassment that, if implemented, could have actually resulted in discipline of the female student rather than termination of the male employee. The ultimate legal issue here is whether the complaint pleads facts that support a minimal, plausible inference of sexual discrimination. I will first address the district court's decision, which relies primarily on Doe v. Columbia, and then I'll move on to the supplemental briefing requested by this court. I don't propose to review all the allegations in the complaint here, but I did want to tick off those that I believe demonstrate that this case is even stronger than the one in Columbia, where the complaint was upheld by the court. First, the backdrop to the sequence of events here is the actual pendency of a Doe Title IX investigation. In Columbia, there was only one requested by a group of students. It was not actually pending, and I think that goes a long way towards explaining why Ms. Mohn was so hostile to the plaintiff, even at the very first meeting with him when she could not possibly have known what the facts were, and that's because the Title IX investigation could have reflected adversely on her as Hofstra's EEO officer. Mr. Howe, help us understand this case a little bit. Your client was an at-will employee, is that right? Correct. And so, in principle, Hofstra was entitled to terminate him for any nondiscriminatory reason, no matter how small. I emphasize the word nondiscriminatory. Nondiscriminatory, but the point here is that the letter- The answer to that is yes, no? The answer- The answer to my question, was Hofstra entitled to terminate Mr. Menneker for any nondiscriminatory- For a nondiscriminatory reason, yes, but the complaint alleges that the reason was discriminatory, and in fact the- That's my next question. All right. How do we know that Mr. Menneker was terminated on account of his sex? Well, there are a number of reasons. One, which I alluded to, is similar to what was in Columbia, but stronger here because, you know, there was actually a DOE investigation pending that was not in Columbia. It was just newspaper publicity. The second is one that Your Honor has written about on a panel with Judge Hall, and I'm referring to Sassaman v. Gamache. So here, a second difference, major difference, to me a very critical difference. In Columbia, they actually followed the procedures. Here, Ms. Moen made no pretense of following Hofstra's own procedures, and what Your Honor wrote in that case was as follows. The failure of an employee to conduct an adequate investigation can constitute evidence in support of a Title VII plaintiff's allegations. So that's point two. Point three, you know, the investigation here wasn't merely inadequate. It was really nonexistent. And an indication of that and also of the discriminatory animus is that Ms. Moen was told face-to-face, directly by Senior Hofstra Administrator, the Athletic Director, that he knew from his own personal knowledge that one of the student's key allegations was false. And she disregarded that. He's the only other male that participated in any way in this process. So she completely disregarded what he told her. Let me turn back a bit. Yep. How do we know that he was terminated on account of his sex? Well, you know, that's what this case is about. Yes. We pleaded, I think, sufficient allegations to indicate that's true. You know, we can't prove it until we have a chance at discovery and to go to trial. And that's what this case is about. It's the pleading stage. All you have to do is, you know, allege facts that support a minimal inference. That's fine. So you want us to apply Doe against Columbia, right? Correct. That was about a student's rights under Title IX. And this is a case of an employee under Title VII. Right. So the cases of legion that the ‑‑ I interrupted your question. No, no, please. I anticipated what it was. The same standards apply whether it's Title IX or Title VII. It doesn't make any difference. There are a number of Second Circuit cases that say that. You know, one of the other indications, I believe, of the discriminatory animus towards the plaintiff here because of his gender is that in Columbia, the court noted that the investigating officer failed to advise the plaintiff of his rights. Here, actually, it went much further than that. Ms. Moan deceived the plaintiff. She's a lawyer. He's a layman. She told him she was going to render a report and give him a copy, which would have given him an opportunity and a fair way to respond to the allegations, and she never did that. In addition, I think this case presents an extraordinary circumstance. Not only was it present in Columbia, but I think it's probably unique, where Hofstra at this very moment is now contesting in a related litigation, in fact denying the very claims upon which Mr. Menneker was terminated. I can't think of another case like that. And what is that exactly going on in that other case? Right. So this is a case that follows on to the student letter to Hofstra, which threatened litigation if she didn't get her way and they didn't give her money. They evidently didn't give her enough money or any money. I don't know what. But anyhow, she filed a Title IX action that's pending in front of Judge Hurley, as this case was. And they're obviously related. Related, yeah. How is it that they weren't consolidated, at least for pretrial purposes? Well, we requested that they be consolidated, but the magistrate judge didn't do that. She said that the cases were closely related, and she encouraged us to coordinate in discovery, but she refused to consolidate them. I believe we appealed that to Judge Hurley, and he affirmed her decision in that regard. And what's the status of that other case? It's right. Ongoing discovery? No, I think Ms. Rosenberg can confirm this, but I believe the discovery is completed, and I think Hofstra was ready to file a summary judgment motion. That's where it stands. All right. Let me ask you about Hofstra's claim that Mr. Menneker was fired for unprofessional conduct, quote, unquote, as opposed to for sexual harassment. How do you respond to that? I respond to that by saying it's a completely pretextual argument. If that were the case, every time Hofstra got an allegation of sexual harassment, they could avoid their procedures. The procedures would be totally meaningless. Hofstra lays out a whole panoply of procedures that are intended to provide fair, due process in resolving these allegations, which can have so much of an impact on everyone concerned. And if Hofstra could just say, well, sure, the student claims sexual harassment, but I, the investigator, by the way, whose only task here is to issue a reasonable cause or no reasonable cause letter, could convert that into something meaningless and not follow them just because she says his conduct is unprofessional. It's totally pretextual, I would argue. Now, what about the Littlejohn case? What's your position on that? Well, I think it supports the arguments here. This is the return on the supplemental briefing. Well, at some point you say that the district court did not apply Littlejohn's standard of minimal plausibility. Is that right? The standard is minimal plausibility. That's what the standard is, and we've met it here. And you think that the district court failed to apply that standard? Yes. I mean, it essentially made findings of fact. And for all the reasons I've indicated so far, there's more than sufficient allegations. Actually, and I argue that they're stronger than they were in Columbia. On the pleading stage, you get us by a motion to dismiss and allow us to do some discovery here. It's a whole sequence of events, I think, that the court has to look at and ask itself what's going on here. And I think we've alleged more than we need to to satisfy that burden. Thanks, Mr. Houck. You've reserved some time. And we'll hear from counsel for Hofstra, Ms. Rosenberg. Good afternoon, Your Honors. May it please the Court. Jill Rosenberg, representing Hofstra University. Your Honors, the district court properly dismissed Mr. Medeker's amended complaint because his allegations fell woefully short of the pleading that's required to get at the heart of Title VII, that is, discriminatory intent. More specifically, he did not allege any facts that could give rise to a minimal inference of gender discrimination. In other words, that he was terminated because he was a man. Throughout this case, as today, counsel has argued that this case is analogous, if not stronger, than Doe v. Columbia. While we don't believe Doe is relevant because it does involve a student on student claim, which involves different sets of issues under Title IX, for purposes of argument, we are willing to adopt the legal framework, which I think does apply. And the court in Columbia, this court did say that, for example, even if there are procedure irregularities, and yes, the plaintiff in Doe alleged multiple procedural irregularities in his disciplinary hearing, what the court said is those procedural irregularities are not enough to raise an inference of gender bias. They might raise a general inference of bias, but there needs to be more. There needs to be specific allegations to connect that bias to gender. There are no such allegations here. One of the set of allegations in the complaint is that not just Ms. Moen, the Deputy General Counsel, but all of the individuals involved were women. And somehow, because women were involved and the male was the accused, that that gives an inference of bias. We've put forth cases to show that that is not the case, that the law does not support that proposition. Similarly, the allegation that Ms. Moen was hostile to Mr. Meneker, I think the allegation is that she asked him a few questions initially in a hostile tone before showing him a document. Again, hostility alone without connecting that to gender is not sufficient. So if I may try to summarize your position, Hofstra takes the view that Mr. Meneker was discharged not for violating any standard under Title IX, but simply because of unprofessionalism. Is that right? Correct. Again, I'm bound by the allegations in the complaint, and I don't want to go beyond those. But as alleged in the complaint, the student came forward and made allegations of sexual harassment. That's what she labeled them in her letter. It was investigated again along the lines—I'm not going to debate the complaint, but there's allegations that it was investigated, not to the fullest extent that the plaintiff believes it should have been, and that at the outcome of that investigation, Mr. Meneker was advised that he was being terminated for unprofessional conduct. Those are the allegations. Yes. Well, Ms. Kaplan's letter accuses Mr. Meneker of unwanted and unwarranted sexual harassment, right? Correct. And Hofstra doesn't believe that accusation? That was the label. What Hofstra did was look at the underlying allegations. What was that unwanted sexual conduct? The sending of Facebook messages, yelling at an opposing player. And your position is that this is not a claim of sexual harassment, but rather of unprofessional conduct? The allegations were of sexual harassment. The ultimate findings that were conveyed to Mr. Meneker were the conclusion was that it was unprofessional conduct and not a Title IX violation. I'm sorry, go ahead. So to the extent that Title IX provides some sort of due process, in your view, it would not be applicable in a situation where you're dealing with unprofessional conduct rather than sexual harassment? The answer to that is yes, but I think there are additional reasons in this case why the procedures that were followed were followed, in terms of how the investigation was conducted, who conducted it. The policy gives the university discretion in how to conduct an investigation of sexual harassment. Thank you, Judge. There's something about this issue of unprofessional conduct. Now, we are to take the allegations in the complaint as true. Am I correct? Correct. Because this is 12-6. But I'm looking at paragraph 43 of the amended complaint, and it says that Mone informed plaintiff, Mone and Miller-Suber informed plaintiff that he was fired for unprofessional conduct, but then the next sentence says his employment was being terminated based on the totality of the allegations. In other words, there's a connection here between the allegations of the student who's making the, who alleged the sexual harassment against the plaintiff here and the unprofessional conduct, is there not? In other words, it's all wrapped up in accordance with paragraph 43. We have to conclude that those are one and the same, are they not? The allegations on which the, again, I'm bound by the complaint, and I don't want to get into evidence beyond this, but based on this complaint and based on this particular allegation, Mr. Menneker was allegedly told that he was being terminated for unprofessional conduct and the totality of the allegations. That's the point I'm trying to make. Again, the student alleged sexual harassment. The university investigated those allegations and made findings. It didn't need to find necessarily that there was sexual harassment or there wasn't. It found, again, based on these allegations and based on the complaint, it found unprofessional conduct. But the issue here, Your Honor, is what, in the way that the university handled this matter, did it handle it in a manner that suggests there was gender bias? And we submit again that there is nothing in this pleading that suggests that there was. Simply because somebody alleges sexual harassment, the conduct ultimately that could be determined, and again, I'm just going to speak hypothetically, can be unprofessional, it may not rise to the level. Sexual harassment is unwanted conduct of a sexual nature that is severe or pervasive and substantially impacts a student's ability to participate in their educational experience. That's the definition of sexual harassment under Title IX. Conduct can be inappropriate. It can be off-color. It can be unprofessional. It can be juvenile. The same conduct that someone alleges as sexual harassment could be found to be not that but something else. That was the label that she used. And so I think getting tied up in what the allegations were versus what the findings are is not the focus here. The focus should be on was there gender bias. Is there any allegation of gender bias? And going back to Columbia University, the linchpin to that case, I believe, as this court held, was the wealth of allegations about issues of gender on campus. They had 23 lawsuits or claims that had been filed with the Office of Civil Rights. There were student protests. The New York Post wrote an article about Columbia dropping the ball on jocks, that male athletes were getting preferential treatment in these hearings. The particular investigator in that case had previously been accused publicly of having gender bias and how she investigated the complaints. All of those allegations taken together led this court to conclude that there were sufficient allegations of gender bias and how those individuals proceeded. There are no such allegations in this case. There are some very general allegations about OCR investigations and students at Hofstra talking about sexual assault by other students. It has nothing to do with the type of issue we're talking about here, which was non-physical harassment allegations against a coach. To follow up on our colleague's line of questioning, Hofstra decided that Menneker was guilty of unprofessional conduct based on the totality of the circumstances, correct? That's what the allegation is at this point, yes. Hofstra didn't say which of any of the allegations they credited, is that right? Again, I can't go beyond the complaint. It's not in the complaint, and so I don't want to go beyond that. I think based upon these allegations, there's nothing to suggest that there was, again, any improper process or any improper motive. And let me go back to one other point that counsel raised about the student's claim. The student has filed her own claim under Title IX pending before Judge Hurley. Discovery has been completed. There's a motion to amend that's pending, but that set of allegations are for sexual harassment under Title IX. As the court can imagine, there are, in the complaint, argumentative and over-the-top allegations to which Hofstra properly made denials. That does not lead to an inconsistent finding or conclusion in this case that Hofstra somehow didn't find Mr. Menneker to have engaged in inappropriate conduct. Let me ask you about the Facebook video. That was one of the reasons for Menneker's firing, is that right? Correct. Have you watched that video? Correct. Yes, I have. So you know it features stick figures? Correct. Softball stick figures? Yeah. Talking about sexual activity and how a man knows if a girl is into her, and then it concludes with, as alleged by the student in her letter, which is part of the complaint, culminates in, again, stick figures supposedly going to have sex. So you've read Mr. Menneker's explanation of the context in which he sent that video? Correct. Yes. And did you consider that context? Again, the university— You're speaking for Hofstra, yes? Yes. You did consider it? Yes. Can you say that a female coach would have been fired under similar circumstances? I think so. I would say that. And you did reach this decision without holding a hearing, is that right? A hearing as described under the policy, correct. There was no hearing. So Mr. Menneker didn't have much of an opportunity to defend himself, did he? I would dispute that. Based upon his own allegations in the complaint, he sat down with the Deputy General Counsel for a meeting. She began to ask him questions. After he asked for a copy of the letter and the documents, she provided those to him. He fully answered the questions. He took the document with him. She asked him to come back and provide more documents. They came back and they met again. He could have provided a response and more information. Mr. Menneker, at the first of these meetings, learned about the Title IX letter, is that right? That's correct. And the second meeting was where he was fired, right? No. There's a second meeting alleged just about a week after the first meeting in early August. Ms. Moen asked him at the first meeting to collect all of his communications with the students and to come back and meet with her, and he did that, as alleged. So it's in the third meeting where he's fired? That would be correct, the third time that they met. And do we know from this record whether Hofstra ever spoke with, that is Hofstra officials, ever spoke with the students and witnesses that Mr. Menneker had identified? That's not in this record, and again, I don't want to go beyond the allegations and the complaint. I know this is not a Title VII case, but would you say that this . . . This is a Title VII case. I'm sorry, that is a Title VII case. But would you say Mr. Menneker received due process? Yes. Weeks before Ms. Kaplan sent her Title IX letter, Mr. Menneker told his supervisor that Ms. Kaplan's father had threatened him, is that right? That is one of the allegations, yes. And Mr. Hathaway, the athletics director, called Ms. Kaplan's letter a tactic and a ploy to get more scholarship money. That's an allegation. That's one of the allegations, correct. Assuming for the argument that these allegations are accurate, as I think we have to at this stage of the game, Hofstra nevertheless fired Menneker, is that right? That is correct, Your Honor. The allegations that the student made, again, of the underlying conduct, you could question based upon the allegations today what were the student's motives. At the time, the student had raised an issue about her scholarship. The underlying conduct was looked at. I know that this Court asked us in supplemental briefing about issues of motive, and this case would not fall into the realm of either a cat's paw case or even a case where the student's discriminatory motive in some way could be relevant, because the student didn't have a discriminatory motive. Her motive, as alleged by Mr. Menneker throughout his complaint, was economic, that somehow she wanted to get a bigger scholarship, and so she raised these allegations. So even if that was her motive, that would not get Mr. Menneker any further along in this case. Tell us about this cat's paw theory that you discuss in your letter brief. Yes. Your Honor, Your Honors had posed a question as to whether there was a way in which a third party who engages in some type of discriminatory conduct, that that conduct could somehow be connected to adverse action. And what we understood the Court to be asking essentially was the cat's paw theory, whether or not, for example, as the Supreme Court said in Staub, if a supervisor held discriminatory animus, but ultimately a decision-maker who was not biased relied upon that, could that give rise to liability. To the extent here— And your answer to that? The answer is yes in Staub. The answer here is there are several elements in Staub that are missing here. First, the individual has to be an agent of the university, an employee or an agent, which a student is not. Second, that student or employee has to act with discriminatory motive, has to act with gender bias, or in the Staub case it was bias against people in the military. Here the student's bias was not of gender. It's not that she had anything against Mr. Menneker because he was a man. The allegation by Mr. Menneker is that the student wanted him out or wanted something different because she wanted more money. And so that is a critical element that is missing here. And then third, the university has to rely upon that individual's bias and know or should have known that that individual is biased on the basis of gender. Again, that allegation is missing here. Thanks, Ms. Rosenberg. Thank you, Your Honor. Mr. Howell, can you reserve some time? Yes, so I think Your Honors have hit upon really the critical matter here is whether this process was fair to Mr. Menneker, and it was not fair. Opposing counsel talked about three meetings. My recollection is there were just two, and I did a quick look at the complaint, and I believe there were just two. So there was this first meeting where Ms. Milne was very hostile to him, and he denied the allegations. And she told him that she was going to render a report, which indicates that she herself believed that the procedure here that she had to follow was Hofstra's procedures for adjudicating claims of sexual harassment. Mr. Menneker is a layman, and he relied on her assurances that he'd have a fair chance to respond to the allegations. She was going to make a report, and he could respond. In the second meeting, she called, didn't tell him why, and he was canned. That's what happened. And Your Honor asked about the Facebook video, and that's a good example of why this is so unfair to Mr. Menneker here. You can get your clerks to look at it online. It's not really a video about sex. Ms. Kaplan was a Canadian, and it's sort of an extended joke about how nice Canadians are. And he never had a chance to explain that at all. You know, he had no chance. He should have had that opportunity under Hofstra's procedures. It was denied to him. Opposing counsel mentioned one of the allegations in the student's complaint, which was the one about yelling obscenities at female tennis players on the other team. And that, in fact, is the very allegation that athletic director Hathaway told Ms. Moan was untrue. And he never really got an opportunity to put all that together. And so, you know, the argument that he was terminated because of unprofessional conduct is really, you know, a pretextual one. And it had nothing to do with his being an at-will employee, which is something the court asked about neither Title IX nor Hofstra's policies nor Title VII, provide any exemption, you know, for at-will employees. And, indeed, if that were true, you know, every law firm associate, assistant district attorney, AUSA assistant attorney general, all at-will employees could be fired for totally discriminatory reasons without recourse to Title VII. So that can't be right as a matter of law. Title VII can't be the only hook that gives one a basis for arguing under a statute that you've been discriminated against. Well, it's the central one here. Yes. So if, in fact, it turns out after a hearing or based on the allegations that Hofstra's claimed that he was fired for unprofessional conduct, and I know you're saying that that's, you know, that's a made-up reason, but that's not discriminatory in and of itself, is it? If one engages in a statute. Well, I think they're all, as I went through my initial argument, I think there are many allegations in the complaint that more than adequately support a minimal inference of discriminatory intent, including the failure to abide by their procedures. So in the case that your honors were on, there was at least some effort to apply the procedures there. Here, you know, there was nothing at all. He had no chance. And what he was really entitled to was a hearing in front of the University Harassment Review Board. Ms. Moan had no authority under Hofstra's policy to terminate him. She was just supposed to say, you know, there's a reasonable cause or not a reasonable cause, and if there was a reasonable cause, there was a whole panoply of procedures, including transcripts, calling witnesses, the burden being on the complainant. So he was denied all of that. And you were asserting claims under both Title VII and Title IX. Title VII. It's an employment case. How about Title IX? Well, you know, Hofstra owes, he's not a student, but Hofstra owes a duty, I think, to all its employees, students, and everyone to have an atmosphere, an environment free of discrimination. And that's also actually stated in Hofstra's own policy. It says, Hofstra abides by the principles that its students, faculty, staff, and administrators have a right to be free from unlawful harassment within the community. And I think as Judge Winner wrote in the Cox case, false allegations of sexual harassment are themselves sexual harassment. So yes, the answer is yes. And in addition, I look to Hofstra's own policies in that regard. Thanks very much. Thank you. We reserve the decision, and we thank both counsel for vigorous and capable arguments. Very much.